MANAGEMENT INSIGHTS,
INC., Plaintiff,

v.

CIC ENTERPRISES, INC., Defendant.

Civil Action No. 3:00–CV–2597–M.

United States District Court,
N.D. Texas,
Dallas Division.

Nov. 19, 2001.

H. Allen Pennington, Jr., Paul Speaker, Pennington Baker, Fort Worth, TX, for plaintiff.

Michael S. Gardner, Bickel & Brewer, Dallas, TX, Geoffrey J. Greeves, Ronald W. Kleinman, Timothy C. Bass, Greenberg Traurig, Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

LYNN, District Judge.

Before the Court is Defendant's Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, filed on March 19, 2001. Having considered Defendant's Motion, along with Plaintiff's Response, Defendant's Reply, and additional briefing requested by the Court, the Court is of the opinion that Defendant's Motion to Dismiss should be GRANTED, for the reasons stated below.

### I. Factual Predicate

Plaintiff Management Insights ("MII"), a Texas corporation, filed suit in this District against CIC Enterprises ("CIC"), an Indiana corporation, alleging violations of the Lanham and Sherman Acts, tortious interference with existing contracts, and slander. Both parties are competitors in the accounting business, providing tax-related services for Fortune 1000 companies. In particular, these entities identify and

procure tax credits under federal and state programs for qualifying corporate clients. One such service provided by both companies consists of ensuring compliance with documentation requirements and regulations related to the Work Opportunity Tax Credit (WOTC). The basis of Plaintiff's original Complaint was an alleged telephone call that took place between CIC and one of MII's customers in Tennessee, during which MII claims CIC's agent stated that MII was discontinuing its WOTC services.

After MII instituted this action, CIC filed a Motion to Dismiss, arguing that it has had no contacts with Texas that would permit this Court to exercise personal jurisdiction over it, and that venue in this District was also improper. In support of its Motion, CIC filed affidavits showing that it had no offices or registered agent for service of process in Texas. MII filed a Response to this Motion arguing that two central bases for jurisdiction existed: (1) that CIC had clients in Texas, and (2) that it had frequent contact with the Department of Labor office in Dallas. Concurrent with the filing of its Response to Defendant's Motion to Dismiss, MII amended its Complaint to allege two other slanderous phone calls made by CIC to an industry competitor located in the Dallas area. The alleged calls took place after the filing of MII's original Complaint.

On May 31, 2001, Plaintiff moved for leave to conduct limited additional discovery on the issue of Defendant's contacts with the state of Texas, specifically asking the Court to allow Plaintiff to depose certain employees of Defendant. The Court issued an Order on June 11, 2001, granting in part and denying in part Plaintiff's motion for leave. The Court found that Plaintiff should be allowed to depose Charles Coriaty, CIC's former Chief Operating Officer, on the issue of jurisdiction, but that Plaintiff could conduct no other discovery on the matter. After Plaintiff deposed Mr. Coriaty, both parties filed supplemental briefs on the Motion to Dismiss.[1] On September 14, 2001, the Court requested additional argument on the issue of whether 15 U.S.C. § 22 (section 12 of the Clayton Act), which provides for nationwide service of process for antitrust violations, would allow the Court to assert personal jurisdiction over Defendant in relation to Plaintiff's Sherman Act claims if the Court found the Defendant had minimum contacts with the United States, instead of with the state of Texas in particular. The parties submitted their briefs on that issue on October 9, 2001.

After consideration of the arguments contained within the parties' original filings on the Motion to Dismiss, as well as the additional briefs requested by the Court, the Court finds that it cannot assert personal jurisdiction over Defendant in reference to any of the causes of action, for the reasons stated below.

## II. General Standards for Assertion of Personal Jurisdiction

■ Fifth Circuit case law provides two distinct avenues by which a Court may assert personal jurisdiction over a defendant. The first, and likely most well-known, route—as it is the sole means of

---

1. Plaintiff argued in its filing that Mr. Coriaty's deposition revealed that additional bases for jurisdiction over CIC existed: (a) CIC had mailed WOTC certification papers for Texas-based employees of its clients to the Texas governmental agency in Austin to which the federal government had delegated the duty of certifying employees for eligibility in the federal WOTC program; (b) CIC had one client in Texas who utilized CIC's "W–2 mailing services"; (c) CIC operated a customer complaint hotline for Carl's Junior restaurants; and (d) CIC's president, Carl Cohen, is president of NEON, a trade organization that has Texas members.

divining personal jurisdiction in diversity cases—predicates a finding of jurisdiction on the Plaintiff's proving that the Defendant had minimum contacts with the forum state so that the haling of the Defendant into courts of that state is consonant with the dictates of due process and with the requisites of the state's long-arm jurisdiction statute. *See, e.g., Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 777 (5th Cir.1986). The second path, implicated solely in cases arising under federal question jurisdiction, inheres in the existence of a federal statutory grant of jurisdiction broader than that allowed under the traditional minimum contacts inquiry. *Submersible Systems v. Perforadora Central,* 249 F.3d 413, 418 (5th Cir.2001) ("Absent a federal statute that provides for more expansive personal jurisdiction, the personal jurisdiction of a federal district court is coterminous with that of a court of general jurisdiction of the state in which the district court sits.").

A prototypical embodiment of such a statute provides for service of process on the defendant "wherever the defendant may be found." *See, e.g.,* 15 U.S.C. § 78aa (1994) (expanded service of process provision in Section 27 of the Securities Exchange Act of 1934); 15 U.S.C. § 1132(e)(2) (expanded service of process provision in ERISA). Courts typically refer to these provisions as "nationwide service of process statutes" because they allow service of process on the Defendant anywhere in the nation. The Fifth Circuit has concluded that the statutes' broad service of process affects a court's jurisdictional analysis in the following manner:

> when a federal court attempts "to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States." ... [I]n such a case the relevant sovereign is the United States, and ... the due process concerns of the Fifth Amendment are satisfied and traditional notions of fair play and substantial justice are not offended where a court exercises personal jurisdiction over a defendant residing within the United States.

*Bellaire Gen. Hosp. v. Blue Cross Blue Shield,* 97 F.3d 822, 825–26 (5th Cir.1996). Thus, the appropriate modus for ascertaining personal jurisdiction in a case that implicates this type of statute becomes a simple recitation of the question whether the defendant had minimum contacts with the sovereignty of the United States. For domestic defendants—that is, defendants residing within the four corners of the nation—the question is answered before it is even asked.[2]

In what is perhaps an unusual circumstance, both the traditional diversity analysis and nationwide contacts approach are implicated in the case at hand. In their original briefing on the issue of jurisdiction, both parties argued the case as if it were in federal court purely on grounds of diversity, applying the traditional forum state analysis to the question of whether

---

**2.** On account of the unapologetic simplicity of the "nationwide contacts" approach, one Fifth Circuit panel has criticized its use in cases involving national service of process statutes, reasoning that the traditional forum state analysis defines the limits of due process in *all* contexts: "Although we dutifully apply [the national contacts test], we emphasize our disagreement with it.... We view personal jurisdiction and service of process as conceptually distinct issues. We fail to apprehend how personal jurisdiction can be separated from due process by Congressional enactment of nationwide service of process provisions." *Bellaire,* 97 F.3d at 826. Despite this criticism, the *Bellaire* court refused to abrogate the test, and this Court stands ready to apply it in this case.

the Court may assert personal jurisdiction over the Defendant. As two of Plaintiff's claims are based on the Sherman Act, however, the Court must look also to 15 U.S.C. § 22 (section 12 of the Clayton Act), a nationwide service of process statute applicable to antitrust actions, to determine whether it may assert jurisdiction over the Defendant, at least in relation to Plaintiff's Sherman Act claims, using the nationwide contacts test. The statute provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22 (1994). Another Court in this District has previously held that 15 U.S.C. § 22 is a nationwide service of process statute that involves an inquiry into whether the Defendant has had the requisite contacts with the United States. *See Entek Corp. v. Southwest Pipe & Supply Co.*, 683 F.Supp. 1092, 1101 (N.D.Tex.1988) (Maloney, J.). Thus, the Court must utilize both the traditional "minimum contacts with the forum state" analysis and the "nationwide contacts" standard in this case, first determining whether Defendant is within the reach of this Court's jurisdiction under the former, and, if not, whether the Court may instead apply the nationwide contacts test embodied in 15 U.S.C. § 22 to assert jurisdiction over CIC.

### III. Application of the Traditional Forum State Analysis

■ Under the traditional due process standard, the Court must conduct a dimidiate inquiry: First, it must determine whether CIC is amenable to service of process under the Texas long-arm statute; second, it must ascertain whether the exercise of jurisdiction meets the demands of due process. *Goodworth Holdings, Inc. v. Suh*, No. 3:00–CV–1871, 2001 WL 910388, *2 (N.D.Tex.2001). The Plaintiff bears the burden of establishing the Court's personal jurisdiction over the Defendant. *Id.* In satisfying that burden, however, the Plaintiff "must present only a *prima facie* case. Any genuinely disputed issues of material fact must be resolved in the plaintiff's favor." *Id.*

■ The Texas long-arm statute allows assertion of jurisdiction over a defendant if he is "doing business" within the state. TEX. CIV. PRAC. & REM.CODE ANN. § 17.041–.042 (Vernon 1997). **Texas courts have held that the "broad language of the long-arm statute's 'doing business' requirement permits the statute to reach as far as the federal constitutional requirements of due process will allow."** *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex.1991). Thus, "to determine whether a defendant's acts constitute 'doing business' in Texas so that assertion of jurisdiction over the party complies with the dictates of the long-arm statute, a court need only consider whether jurisdiction is proper according to 'federal constitutional requirements of due process.'" *BeautiControl, Inc. v. Burditt*, No. 3:01CV0744–M, 2001 WL 1149360, *7 (N.D.Tex.2001).

■ The Due Process Clause permits the exercise of personal jurisdiction over a nonresident defendant if

(1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing "minimum contacts" with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend "traditional notions of fair play and substantial justice." To comport with due process, the defendant's conduct in connection with the forum state must be

such that he "should reasonably anticipate being haled into court" in the forum state.

*Latshaw v. Johnston,* 167 F.3d 208, 211 (5th Cir.1999). Two categories of conduct are sufficient to constitute requisite contacts with the forum state: acts specific to the instant suit, or transactions, although unrelated, that are of such a "continuous and systematic" nature as to be "sufficient to allow a court to assert jurisdiction over the party in the particular case." *BeautiControl,* 2001 WL 1149360, at *8. A court's grounding of jurisdiction in the former class of conduct is known as specific jurisdiction, while a finding of jurisdiction based on the latter class is deemed general jurisdiction. *Id.* Plaintiff asserts that the Court has personal jurisdiction over CIC based on both specific and general jurisdiction.

### A. Specific Jurisdiction

 MII first argues that the Court has specific jurisdiction over Defendant because CIC allegedly made slanderous statements in two telephone conversations with a competitor in Rockwall, Texas, after the filing of the original Complaint. The Court concludes, however, that these incidents cannot be considered in determining whether the Court has jurisdiction over CIC because jurisdiction must be determined based upon facts existing at the time Plaintiff filed its original Complaint. *See Asarco, Inc. v. Glenara, Ltd.,* 912 F.2d 784, 787 n. 1 (5th Cir.1990). Thus, in determining whether it can assert specific jurisdiction over CIC, the Court must consider only the telephone call allegedly made by CIC to MII's Tennessee customer before MII filed its lawsuit.

MII asserts that the Tennessee phone call is sufficient for this Court to assert specific jurisdiction over CIC because the slanderous statements made during the call caused repercussions within Texas, where MII is headquartered. This allega-tion "requires the Court to use the 'effects' test, which the Fifth Circuit has previously applied in deciding whether a court has jurisdiction over a ... claim that arises from an act committed out-of-state by a nonresident defendant that causes in-state effects." *BeautiControl,* 2001 WL 1149360 at *12; *see also id.* (examining the origin of the effects test, as well as the Fifth Circuit's and Northern District of Texas's application of the test to cases in which a defendant has had no previous contact with the state other than to take an action that caused deleterious effects within the state). MII relies on *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), the case that introduced the effects test, as support for its claim that the Court has jurisdiction over CIC based on CIC's alleged tortious conduct, which MII contends was calculated to cause injury to the Plaintiff in Texas. The facts of *Calder* were significantly different from those in the case at hand, however. The *Calder* Court held permissible a California district court's assertion of jurisdiction over the defendants, who were Florida residents, finding that the defendants' "intentional conduct in [their home state was] calculated to cause injury to" the plaintiff, who lived and worked in California. *Id.* at 791, 104 S.Ct. 1482. The defendants, a reporter and editor for the *National Enquirer,* participated in the creation of an allegedly libelous article about the plaintiff which had been published nationwide, including in California. *See id.* at 784, 104 S.Ct. 1482. The Court held defendants liable because "the brunt of the harm, in terms of both respondent's emotional distress and the injury to her professional reputation, was suffered in California." *Id.* at 788–89, 104 S.Ct. 1482. Therefore, the Court found that the defendants must have " 'reasonably anticipate[d] being haled into court there' to answer for the truth of the statements made in their article." *Id.* at 790, 104 S.Ct. 1482 (quoting *World–Wide*

*Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

*Calder* is thus dissimilar to the case at hand because the *Calder* defendants recognized that the allegedly false story was to be circulated in the plaintiff's home state. In fact, another Court within this District has recognized that the effects test is limited to situations in which the plaintiff has shown that the defendant purposefully directed his tortious activity at the forum state. In *Bell Helicopter v. C & C Helicopter Sales,* 3:00–CV–1516–X, 2001 WL 290569 (N.D.Tex. Mar.21, 2001) (Kendall, J.), the Court refused to assert personal jurisdiction over the nonresident defendants despite the plaintiff's urging that it had suffered the effects of defendants' tortious conduct within the state. Finding that "[t]he Fifth Circuit's interpretations of *Calder v. Jones* ... caution against exercising personal jurisdiction purely based on the allegation of an intentional tort and the fact that injury alone is felt in the forum state," the Court held that something more than the mere fortuity of the plaintiff's presence in the forum state was needed to justify assertion of jurisdiction over the defendants. *Id.* at *4. Because the plaintiff failed to present evidence that the defendants purposefully aimed their tortious activity at the forum state, the Court found personal jurisdiction lacking. *See id.*

The case at hand presents this Court with a similar situation. CIC's agent in Indiana allegedly made the telephone call to MII's customer in Tennessee. MII has presented no evidence that the slanderous statements ever reached Texas, or that CIC ever purposefully directed them at Texas. The only way in which Texas is implicated in this transaction at all is be-

cause Plaintiff is located in Texas, which, like the location of the plaintiff in *C & C,* is a "mere fortuity." To hold otherwise would be to destroy altogether the limits imposed by due process. Such a finding would allow every plaintiff who filed suit in its home state to justify assertion of jurisdiction over a defendant simply by averring that the plaintiff was injured by the defendant's out-of-state conduct. Thus, the Court finds that CIC's allegedly slanderous call to MII's customer in Tennessee is insufficient to support specific jurisdiction over CIC.

**B. General Jurisdiction**

Having found that it lacks specific jurisdiction over Defendant, the Court must now consider whether CIC has surrendered to the jurisdiction of Texas courts through its general business contacts with Texas. The Court may assert general jurisdiction over Defendant if CIC has had continuous and systematic contacts with the forum state. *See Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). MII lists several types of contacts that it claims subject CIC to this Court's jurisdiction: (a) MII's dealings with its WOTC clients and "W–2 mailing service" clients located in Texas; (b) CIC's operation of a customer complaint hotline for Carl's Junior restaurants, some of which are located in Texas; (c) CIC President Carl Cohen's interaction with Texas members of NEON, a trade association to which CIC and other tax credit businesses belong; and (d) MII's contacts with the U.S. Department of Labor office in Dallas and the Texas state agency in Austin responsible for certifying Texas-based employees of CIC's clients as eligible for the federal WOTC program.[3]

---

3. MII's Amended Complaint also asserts that this Court has jurisdiction over Defendant because Defendant has a website that is ac-

cessible by Texas residents. The Fifth Circuit has held that in situations "where a defendant

## 1. Client Contacts

Plaintiff does not dispute that Defendant has no Texas office, no telephone listing in Texas, no registered agent in Texas, performs no services in Texas, and does not advertise in any publications that circulate in Texas. In fact, the only connections CIC maintains with Texas are that it has five WOTC clients[4] who are located in Texas, which a CIC agent visits approximately three days per year, that "other CIC employees involved in sales efforts may periodically and sporadically be present in Texas . . . up to an estimated total of 10 business days per year," and that CIC has one Texas client that participates in CIC's W–2 mailing service. CIC performs all of the services for its Texas clients in Indiana.

The Court finds these contacts to be insufficient for assertion of jurisdiction over Defendant. Another Court within this District has previously refused to find the existence of personal jurisdiction based on a similar fact pattern. *See Management Insights, Inc. v. APG, Inc.,* No. 3:00–CV–2779–X, slip op. (N.D.Tex. May 10, 2001) (Kendall, J.) (order granting motion to dismiss for lack of personal jurisdiction). In *APG,* the Court held that the defendants could not be subject to personal jurisdiction in Texas based on the fact that the defendants had a small number of

clients in the state and made infrequent trips in-state to visit those clients. The Court found that because the services provided to the defendants' Texas clients were actually performed in Virginia, sufficient minimum contacts with Texas did not exist.[5]

Similarly, CIC has virtually no connection to Texas, save a handful of clients with whom CIC interacts sporadically. "Conduct of single or isolated items of activities in a state [on] the corporation's behalf are not enough to subject it to [general jurisdiction]." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 317, 66 S.Ct. 154, 90 L.Ed. 95 (1945). A court may only assert general jurisdiction over a corporate defendant if the defendant's "continuous corporate operation within a state [is] thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Id.* CIC representatives' infrequent visits to Texas simply do not qualify as the type of substantial activities that would warrant a finding of general jurisdiction in this case. *See Nichols v. G.D. Searle & Co.,* 991 F.2d 1195 (4th Cir.1993) (holding that personal jurisdiction did not exist when the defendant corporation's contacts with the forum state were insubstantial).

---

merely establishes a passive website that does nothing more than advertise on the Internet . . . ., personal jurisdiction is not appropriate." *Mink v. AAAA Dev. L.L.C.,* 190 F.3d 333, 336 (5th Cir.1999). Since CIC's website apparently does not allow employees of Defendant to "engag[e] in business transactions with forum residents or enter[ ] into contracts over the Internet," it cannot constitute a valid basis for general jurisdiction. *Id.*

4. These clients make up less than two percent of Defendant's customers.

5. The Court reasoned,
 The core facts are uncontroverted. Defendants have no offices in Texas . . . . Defen-

dants have no bank account, mailbox, or telephone listing in this state. Visits by their staff have been minimal, sporadic, [and] marginally profitable. . . . The weight of these facts tilts the balance strongly against the exercise of general jurisdiction. . . . Although Defendants have Texas-based clients, research Texas law, and process some forms from Texas employees, operations are performed in Virginia. These ties do not add up to purposeful availment of the privileges of conducting activities here.
 *APG,* slip op. at 7.

### 2. *Carl's Junior Hotline and Trade Association Contacts*

■ Plaintiff also asserts that CIC's operation of a Carl's Junior telephone hotline, which allows employees of the restaurant chain to "report problems with management, sexual harassment[,] and the like," subjects CIC to this Court's jurisdiction because Carl's Junior, a restaurant chain with restaurants in several states, has eighteen locations in Texas. The existence of a hotline accessible to Texas employees is, under these circumstances, insufficient to confer jurisdiction on this Court. The Court finds instructive a District of Kansas case in which the plaintiff argued that the court had general jurisdiction over the Defendant because the Defendant had a 1–800 number, used primarily for sales and distribution of Defendant's products, that was accessible by residents of Kansas. *See Composite Marine Propellers, Inc. v. VanDerWoude,* 741 F.Supp. 873, 875 (D.Kan.1990). The plaintiff produced no evidence that the telephone service was specifically aimed at Kansas residents. The court rejected the existence of the telephone line as creating jurisdiction over the defendant in the forum state, reasoning that " '1–800' numbers that are accessible to Kansas residents, absent something more, are insufficient to establish minimum contacts." *Id.* at 878. Applying the same logic to the existence of the Carl's Junior hotline, this Court finds that CIC's operation of the telephone service does not create general jurisdiction over CIC.

■ Defendant's argument that the Court has general jurisdiction over CIC because CIC's president, Carl Cohen, is also president of NEON, a trade organization that has members who are located in Texas, hangs by an even finer thread. Any contacts Mr. Cohen has with Texas residents as president of NEON simply have nothing to do with CIC, and are thus wholly irrelevant to this inquiry.

### 3. *Government Contacts*

■ MII argues that, even ignoring CIC's client contacts in Texas, the Court is justified in a finding of general jurisdiction because Defendant is in "semi-continuous contact" with the U.S. Department of Labor ("DOL") in Dallas and because CIC mails forms to certain state agencies, including one such agency in Texas, that has been delegated the duty by the federal government of certifying employees of companies seeking WOTC credits as eligible for WOTC tax credit treatment. In support of its DOL contention, MII proffers the affidavit of Cynthia Sprigg, Vice President of MII, in which she testified:

> In connection with their involvement in work opportunity credits for businesses, all of the companies in our industry who do work in this part of the country ... regularly work with, correspond with, submit applications to, and have telephone conferences with, employees of the Dallas regional office of the U.S. Department of Labor, which serves a several state area, including Texas....

Sprigg Aff. ¶ 16. Additionally, MII proffered to the Court a deposition excerpt from Lawrence Glick of Glick & Glick, a competitor in the WOTC market, in which Mr. Glick explained that some firms within the industry have contacts with the Department of Labor office ("DOL") in Dallas. Glick Dep. at 37–39. However, Mr. Glick explained that such contact is made "infrequently." *See id.*

The Court concludes that the DOL evidence cannot substantiate a finding of general jurisdiction over CIC. First, Plaintiff has presented no proof that CIC ever contacted the DOL in Dallas. Additionally, even if the Court accepts as true Ms. Sprigg's conclusory statement that "all of

the companies" in the industry work with the DOL, the Court still has no basis upon which to judge the frequency of CIC's contacts with the DOL.

Furthermore, were the Court to assume, *arguendo*, that CIC does have regular and continuous contact with the DOL, the Court finds that the government contacts exception to personal jurisdiction applies to restrict the Court from premising extension of jurisdiction over CIC on its contacts with a governmental entity. The government contacts doctrine originated in the federal courts for the District of Columbia, which were frequently presented with cases in which plaintiffs had premised existence of personal jurisdiction in that forum on the defendants' interaction with a governmental entity headquartered in Washington, D.C. *See, e.g., Siam Kraft Paper Co. v. Parsons & Whittemore, Inc.*, 400 F.Supp. 810 (D.D.C.1975) (explaining that the government contacts doctrine "denies personal jurisdiction over non-residents whose only contact with this jurisdiction involves uniquely governmental activities"). Since the doctrine's creation, courts in other jurisdictions have utilized it in suits involving allegations of a defendant's contact with a governmental office located within the applicable forum state. *See, e.g., Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 51–52 (2d Cir.1991); *Lamb v. Turbine Designs, Inc.*, 41 F.Supp.2d 1362, 1365 (N.D.Ga.1999) ("Rooted in the constitutional right to petition the government and first recognized in the District of Columbia, the 'governmental contacts' principle prevents a court from exercising jurisdiction based solely on a defendant's contact with a federal instrumentality."). Although the Fifth Circuit has not yet applied the doctrine, this Court finds that the doctrine should be applicable to the case at hand. Thus, even if Plaintiff could proffer facts sufficient for this Court to find that CIC has had continuous and systematic contacts with the DOL in Dallas, the government contacts doctrine prevents this Court's resting of jurisdiction on those contacts.[6]

The Court finds that the government contacts exception compels the same result in reference to Plaintiff's state agency argument. Defendant argues that the Court should find that general jurisdiction exists over CIC because CIC forwards paperwork to a state agency in Texas responsible for certifying workers who reside in Texas as eligible for WOTC treatment. Mr. Coriaty explained that CIC must send such certification paperwork to state agencies because the states themselves are responsible for administering the federal

---

6. The Court notes that, in applying the doctrine, it is irrelevant that CIC interacted with the DOL while conducting its business (i.e., with a profit-seeking motive). Cases applying this doctrine have made clear that it applies so long as the defendant's communications with the governmental entity arise from the entity's status as an arm of the government, instead of its status as an ordinary market participant. For instance, the doctrine would be inapplicable if the defendant was a building contractor who had been hired by the DOL to construct an office building in Dallas, for in that circumstance, the DOL would be in the position of any ordinary private firm that sought the construction of a business facility, and the defendant would be interacting with the DOL just as it would with any of its ordinary private clients. *See Siam Kraft Co.*, 400 F.Supp. at 812. In the present context, however, Defendant's contacts with the DOL in Dallas arise solely from the DOL's status as the operator of the federal WOTC program—a governmental initiative. *See id.* ("[T]he plaintiff attempts to distinguish the instant case as involving 'commercial' contacts with the Government.... The defendant in this case, however, has not engaged in sales to the Government[,] but rather has merely taken advantage of its services.... We find that such activities are well within the traditional 'government contacts' principle...."). The fact that CIC does so for profit is of no consequence.

WOTC program. *See* Coriaty Depo. at 71.[7] Thus, the federal government has delegated to state agencies the responsibility of certifying which employees of a company seeking WOTC credits qualify for WOTC treatment under the federal tax program. Mr. Coriaty specified that CIC only interacts with the state agency in this role. The Court concludes that, because the Texas state agency to which CIC mails the WOTC certification forms for its clients is acting with power delegated by the federal government, the government contacts exception to personal jurisdiction applies to CIC's contacts with the agency so as to immunize them from consideration in this Court's personal jurisdiction inquiry.

### IV. Clayton Act National Service of Process Analysis

■ In reviewing the parties' submissions on the issue of personal jurisdiction, the Court raised *sua sponte* the question of whether section 12 of the Clayton Act operates to allow assertion of personal jurisdiction over Defendant, at least in relation to the alleged antitrust violations. The Court finds, however, that section 12 is inapplicable to the case at hand, because operation of the statute is predicated upon proper venue, which is lacking in this case. The statute is divided into two parts. The first part, which deals with proper venue in antitrust cases, provides that "[a]ny suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business." The second part, which contains the broadened service of process provision, explains, "and all process in such cases may be served in the district of which it is

an inhabitant, or wherever it may be found." Defendant argues that the first clause (the venue provision) acts as a precondition to the second (the nationwide service of process provision) so that Plaintiff cannot invoke the service of process provision without having satisfied the first part's venue requirement. Plaintiff, in turn, asserts that the first clause does not act as a prerequisite to the second; instead, they should be read apart from one another, so that the venue analysis under section 12 does not act as a prerequisite to that relating to personal jurisdiction.

The Court recognizes that a circuit split exists in relation to this inquiry. The Ninth Circuit has held that the venue provision of section 12 does not act to limit application of the nationwide service of process statute only to those cases in which proper venue under section 12 has been demonstrated. *See Go–Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406 (9th Cir. 1989). The *Go–Video* court found that although proper venue was a precondition to application of section 12's nationwide service of process provision (with its concomitant "national contacts" personal jurisdiction standard), section 12's venue clause was not the exclusive statute that could be applied to determine proper venue. Rather, *either* 28 U.S.C. § 1391 (the general venue provision) or section 12's venue provision could be applied by a court in determining whether venue was proper. In contrast, the Second Circuit, and more recently, the D.C. Circuit, have concluded that a suit must satisfy the specific venue provisions of section 12 instead of satisfying those in 28 U.S.C. § 1391 before a court may turn to the question whether a defendant has met the "national contacts" test for personal jurisdiction. *GTE New*

---

**7.** Although the exact number of certifications sought on behalf of clients is unclear, CIC was successful in receiving certification from the Texas state agency for 3,599 employees of its clients in 2000 (out of 74,256 total certifications throughout the United States for CIC).

*Media Servs. Inc. v. BellSouth Corp.,* 199 F.3d 1343, 1350 (D.C.Cir.2000); *Goldlawr, Inc. v. Heiman,* 288 F.2d 579, 581 (2d Cir.1961). In *GTE New Media Services,* the D.C. Circuit reasoned,

> [t]he language of [section 12] is plain, and its meaning seems clear: The clause before the semicolon relates to a supplemental basis for venue in actions under the Clayton Act; the clause after the semi-colon relates to nationwide service of process in antitrust cases; and invocation of the nationwide service clause rests on satisfying the [section 12] venue provision.

*GTE,* 199 F.3d at 1350.

The Court finds the latter courts' approach to be the more reasonable in light of the plain meaning of the statute, and therefore adopts it for purposes of discerning the proper venue analysis in this case. The D.C. Circuit explained its divergence from the Ninth Circuit's approach by stating:

> The [Ninth Circuit's] desire to view Section 12's venue provision as [supplementing, rather than supplanting, other venue provisions such as 28 U.S.C. § 1391] does not justify the Ninth Circuit's total disregard of the first clause [of section 12], particularly given the literal convolutions required to jettison the first clause. Indeed, it seems quite unreasonable to presume that Congress would intentionally craft a two-pronged provision with a superfluous first clause, ostensibly to link the two provisions with the "in such cases" language, but none-

theless fail to indicate clearly anywhere that it intended the first clause to be disposable.

*GTE,* 199 F.3d at 1351. The *GTE* court reasoned that the Second Circuit's approach to venue under Section 12, which presents a plain reading of the text of the statute,[8] is simply more compatible with the language of section 12. *Id.*

This Court finds the approach taken by the D.C. and Second Circuits to be the more reasonable not only in light of the structure and wording of the statute, but also because the alternate reading leads to nonsensical results. Under the Ninth Circuit's approach as stated in *Go–Video,* a court could reach the nationwide service of process prong of section 12 after a plaintiff established that venue was proper under *either* section 12's venue provision or 28 U.S.C. § 1391, the general venue statute. In *Go–Video,* the court found that the nationwide service of process provision applied because the plaintiff had proven proper venue under § 1391(d), which provides that "[a]n alien may be sued in any district." 28 U.S.C. § 1391(d) (1994). The court found that this approach complied with Congress's purpose in section 12, which was to "allow[ ] the allegedly injured party a greater range of potential places in which to bring suit." *Go–Video,* 885 F.2d at 1413.

However, in reaching its decision, the *Go–Video* court ignored the existence of § 1391(c), which, when taken together with the Ninth Circuit's reading of section 12,

---

8. The Second Circuit, in *Goldlawr, Inc. v. Heiman,* 288 F.2d 579, 581 (2d Cir.1961), reasoned that section 12

> specifies [that a] suit against a corporation under the antitrust laws may be brought, namely, in a district where it is an inhabitant and also where "it may be found or transacts business["].... By statutory grant[,] if suit is brought as prescribed in this section "all process in such cases may

> be served in the district of which [the corporation] is an inhabitant, or wherever it may be found." Thus, "in such cases," Congress has seen fit to enlarge the limits of the otherwise restricted territorial areas of process. In other words, the extraterritorial service privilege is given only when the other requirements are satisfied.

> *Id.*

completely eviscerates any semblance of a venue inquiry in antitrust cases involving corporate defendants—a result this Court finds Congress could not have intended. Section 1391(c) reads:

> *For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced.* In a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts.

28 U.S.C. § 1391(c) (1994) (emphasis added). Under this section of the venue statute, a corporate defendant "resides" in a judicial district, so that venue is established under § 1391(a) or (b), so long as it is subject to personal jurisdiction in that district. Thus, the Ninth Circuit's reading of section 12, which allows a national contacts personal jurisdiction analysis if venue is proper under section 12 or § 1391, coupled with § 1391(c)'s provision that venue is proper for corporate defendants as long as personal jurisdiction exists in a particular district, requires a court's inquiry into venue and jurisdiction in antitrust cases to become indisputably circular and monolith-ic. Section 1391(c) coalesces with the service of process portion of section 12 to ask the unified question: Has the corporate defendant had the requisite minimum contacts with the United States? If the defendant is a domestic corporation, the Ninth Circuit's approach, in conjunction with § 1391(c), allows a plaintiff to sue a defendant *in any district*, even if that district has absolutely no relation to the defendant's business or to the incident that prompted the suit.[9] For instance, a Texas plaintiff could hale an Alaskan corporate defendant into its courts even though the defendant has had no dealings at all with the forum state. The *Go–Video* court pointed to no legislative history that supports such a broad reading of section 12, and this Court finds that such an interpretation is indeed contrary to the plain meaning of the statute.

Thus, the Court finds that it cannot apply the "nationwide contacts" approach to the issue of personal jurisdiction over CIC unless MII has established that venue is proper under the venue provision of section 12. This requires that MII have proffered evidence that CIC (a) inhabits this District, (b) is "found" in this District, or (c) "transacts business" here. 15 U.S.C. § 22 (1994). "Being an 'inhabitant' is held to mean incorporated under the laws of that jurisdiction[, while being] 'found' in a district is generally equated with 'doing business' there, and requires greater contacts than does 'transacting business.'" *Gen. Elec. Co. v. Bucyrus–Erie Co.*, 550 F.Supp. 1037, 1041 n. 5 (D.C.N.Y.1982). In addition, "[c]ourts have found that a

---

**9.** The Supreme Court's conclusion regarding § 1391(c)—that it was only intended to allow for proper venue in "any judicial district in which the corporate defendant 'is doing business,'" not in any district regardless of whether the corporation has any connection to it whatsoever—supports this Court's interpretation of the interaction between section 12's venue provision and the general venue provisions of § 1391. *Pure Oil Co. v. Suarez*, 384 U.S. 202, 205, 86 S.Ct. 1394, 16 L.Ed.2d 474 (1966). In fact, the *Pure Oil* Court held that although § 1391(c) applies to venue statutes "using residence as a criterion," it does so only in "the absence of contrary restrictive indications in any such statute." *Id.*

corporation transacts business within their forum jurisdictions when a substantial business activity is performed within the jurisdiction with continuity of character, regularity, contemporaneous with the service and not looking toward cessation of business." *Daniel v. Am. Bd. of Emergency Med.*, 988 F.Supp. 127, 260 (W.D.N.Y. 1997).

Using these standards, the Court finds that this District does not constitute the proper venue for this case under section 12 of the Clayton Act. First, CIC obviously is not an inhabitant of this District, as it was not incorporated under the laws of Texas. Second, Defendant does not "transact business" in this District, for the reasons stated above in this Court's discussion of CIC's contacts with this District in Part III.[10] Because Defendant does not transact business here, it also is not "found" here.

In conclusion, the Court finds that it cannot apply the nationwide service of process provision within section 12 of the Clayton Act to CIC, because Plaintiff has failed to establish proper venue under the venue prong of section 12. Thus, the Court is left with its analysis of whether it can assert personal jurisdiction over Defendant using the traditional minimum contacts approach. The Court determines that it cannot, for the reasons set forth in Part III. Therefore, the Court concludes that it must GRANT Defendant's Motion to Dismiss for Lack of Personal Jurisdiction.

SO ORDERED.

---

10. *E.g.*, CIC has no corporate presence in Texas save a few clients that make up less than two percent of CIC's business, it performs all work for those clients in Indiana, and its communications with the DOL in Dallas, if any, are exempted from consideration under the government contacts doctrine.